AO 106A  (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT
for the

District of Columbia

In the Matter of the Search of           )
*(Briefly describe the property to be searched*   )
*or identify the person by name and address)*   )
INFORMATION ASSOCIATED WITH ONE ACCOUNT STORED   )    Case No. 21-sc-1711
AT PREMISES CONTROLLED BY GOOGLE LLC PURSUANT TO   )
18 U.S.C. 2703 FOR INVESTIGATION OF VIOLATION OF 18   )
U.S.C. §§ 2, 371, 1512(c)(2), 1752(a) AND 40 U.S.C. §§ 5104(e)(2)(D)   )
AND (G)   )

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See attachment A, incorporated herein by reference.

located in the     Northern     District of     California     , there is now concealed *(identify the person or describe the property to be seized)*:

See attachment B, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

❏ contraband, fruits of crime, or other items illegally possessed;

❏ property designed for use, intended for use, or used in committing a crime;

❏ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|

18 U.S.C § 371 - Conspiracy; 18 U.S.C. § 2 Aiding & Abetting; 18 U.S.C. §1512(c)(2) - Obstruct Official Proceeding; 18 U.S.C. § 1752(a) - Knowingly Entering or Remaining in any Restricted Building or Grounds Without Lawful Authority; 40 U.S.C. § 5104(e)(2)(D),(G)- Violent Entry and Disorderly Conduct on Capitol Grounds.

The application is based on these facts:

See attached affidavit.

❏ Continued on the attached sheet.

❏ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's  signature*

Anthony L. Tomeo, Special Agent, FBI
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

_____telephone_____ *(specify reliable electronic means).*

Date:    05/26/2021

*Judge's signature*

City and state:  Washington, D.C.               Robin M. Meriweather, U.S. Magistrate Judge
*Printed name and title*

AO 93C  (08/18)  Warrant by Telephone or Other Reliable Electronic Means          ☐ Original          ☐ Duplicate Original

# UNITED STATES DISTRICT COURT
### for the
### District of Columbia

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) | Case No.  21-sc-1711 |
| INFORMATION ASSOCIATED WITH ONE ACCOUNT STORED AT PREMISES CONTROLLED BY GOOGLE LLC PURSUANT TO 18 U.S.C. 2703 FOR INVESTIGATION OF VIOLATION OF 18 U.S.C. §§ 2, 371, 1512(c)(2), 1752(a) AND 40 U.S.C. §§ 5104(e)(2)(D) AND (G) | ) ) ) ) | |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____Northern_____ District of _____California_____
*(identify the person or describe the property to be searched and give its location)*:

See attachment A, incorporated herein by reference.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See attachment B, incorporated herein by reference.

**YOU ARE COMMANDED** to execute this warrant on or before _____June 8, 2021_____ *(not to exceed 14 days)*
☐ in the daytime 6:00 a.m. to 10:00 p.m.   ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____Robin M. Meriweather_____ .
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for _____ days *(not to exceed 30)*   ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued:   _____05/26/2021_____          _____
                                                                          *Judge's signature*

City and state:      _____Washington, D.C._____          Robin M. Meriweather, U.S. Magistrate Judge
                                                                          *Printed name and title*

AO 93C  (08/18) Warrant by Telephone or Other Reliable Electronic Means (Page 2)

| **Return** | | |
|---|---|---|
| Case No.:<br>  21-sc-1711 | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name(s) of any person(s) seized: | | |

**Certification**

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

**<u>ATTACHMENT A</u>**
**Property to Be Searched**

This warrant applies to information which is associated with the Google account(s) identified by arthur@expansiveman.com and which is stored at premises owned, maintained, controlled, or operated by Google LLC, a company that accepts service of legal process at 1600 Amphitheatre Parkway, Mountain View, California.

**ATTACHMENT B**

**Particular Things to be Seized and Procedures to
Facilitate Execution of the Warrant**

I.     **Information to be disclosed by Google LLC ("PROVIDER") to facilitate
       execution of the warrant**

To the extent that the information described in Attachment A is within the possession,

custody, or control of PROVIDER, including any records that have been deleted but are still

available to PROVIDER, PROVIDER is required to disclose the following information to the

government corresponding to each account or identifier ("Account") listed in Attachment A:

a.     For the time period November 3, 2020 – present: The contents of all

communications and related transactional records for all PROVIDER services used by an Account

subscriber/user (such as e-mail services, calendar services, file sharing or storage services, photo

sharing or storage services, remote computing services, instant messaging or chat services, voice

call services, or remote computing service (e.g., Google Drive), including but not limited to

incoming, outgoing, and draft e-mails, messages, calls, chats, and other electronic

communications; attachments to communications (including native files); source and destination

addresses and header or routing information for each communication (including originating IP

addresses of e-mails); the date, size, and length of each communication; and any user or device

identifiers linked to each communication (including cookies); electronic communication services

such as Google Voice (voice calls, voicemail, and SMS text messaging), Hangouts (instant

messaging and video chats), Google+ (social networking), Google Groups (group discussions),

Google Photos (photo sharing), and YouTube (video sharing); web browsing and search tools such

as Google Search (internet searches), Web History (bookmarks and recorded browsing history),

and Google Chrome (web browser); online productivity tools such as Google Calendar, Google

Contacts, Google Docs (word processing), Google Keep (storing text), Google Drive (cloud

storage), Google Maps (maps with driving directions and local business search) and other location services, and Language Tools (text translation); online tracking and advertising tools such as Google Analytics (tracking and reporting on website traffic) and Google AdWords (user targeting based on search queries); Pixel Phone (services which support a Google smartphone); and Google Play (which allow users to purchase and download digital content, e.g., applications);

b.   For the time period November 3, 2020 – present:  The contents of all other data and related transactional records for all PROVIDER services used by an Account user (such as e-mail services, calendar services, file sharing or storage services, photo sharing or storage services, remote computing services, instant messaging or chat services, voice call services, or remote computing services (e.g., Google Drive), including any information generated, modified, or stored by user(s) or PROVIDER in connection with the Account (such as contacts, calendar data, images, videos, notes, documents, bookmarks, profiles, device backups, and any other saved information);

c.   For the time period November 3, 2020 – present: All PROVIDER records concerning the online search and browsing history associated with the Account or its users (such as information collected through tracking cookies);

d.   For the time period November 3, 2020 – present: All records and other information concerning any document, or other computer file created, stored, revised, or accessed in connection with the Account or by an Account user, including the contents and revision history of each document or other computer file, and all records and other information about each connection made to or from such document or other computer file, including the date, time, length, and method of connection; server log records; data transfer volume; and source and destination IP addresses and port numbers;

e.   All records regarding identification of the Account, including names, addresses, telephone numbers, alternative e-mail addresses provided during registration, means and source of

payment (including any credit card or bank account number), records of session times and durations (including IP addresses, cookies, device information, and other identifiers linked to those sessions), records of account registration (including the IP address, cookies, device information, and other identifiers linked to account registration), length of service and types of services utilized, account status, methods of connecting, and server log files;

    f.   All records pertaining to devices associated with the Account and software used to create and access the Account, including device serial numbers, instrument numbers, model types/numbers, International Mobile Equipment Identities ("IMEI"), Mobile Equipment Identifiers ("MEID"), Global Unique Identifiers ("GUID"), Electronic Serial Numbers ("ESN"), Android Device IDs, phone numbers, Media Access Control ("MAC") addresses, operating system information, browser information, mobile network information, information regarding cookies and similar technologies, and any other unique identifiers that would assist in identifying any such device(s), including unique application numbers and push notification tokens associated with the Account (including Apple Push Notifications ("APN"), Google Cloud Messaging ("GCM"), Microsoft Push Notification Service ("MPNS"), Windows Push Notification Service ("WNS"), Amazon Device Messaging ("ADM"), Firebase Cloud Messaging ("FCM"), and Baidu Cloud Push);

    g.   Basic subscriber records and login history (including, as described in 18 U.S.C. § 2703(c)(2), names, addresses, records of session times and durations, length of service and types of service utilized, instrument numbers or other subscriber numbers or identities, and payment information) concerning any PROVIDER account (including both current and historical accounts) ever linked to the Account by a common e-mail address (such as a common recovery e-mail address), or a common telephone number, means of payment (*e.g.*, credit card number), registration or login IP addresses (during one-week period), registration or login cookies or similar

technologies, or any other unique device or user identifier;

h.    For the time period of November 3, 2020 - present: All information held by PROVIDER related to the location and location history of the user(s) of the Account, including geographic locations associated with the Account (including those collected for non-PROVIDER based applications), IP addresses, Global Positioning System ("GPS") information, and information pertaining to nearby devices, Wi-Fi access points, and cell towers;

i.    For the time period November 3, 2020 – present:  All records of communications between PROVIDER and any person regarding the Account, including contacts with support services and records of actions taken; and

j.    Information about any complaint, alert, or other indication of malware, fraud, or terms of service violation related to the Account or associated user(s), including any memoranda, correspondence, investigation files, or records of meetings or discussions about the Account or associated user(s) (but not including confidential communications with legal counsel).

Within 7 days of the issuance of this warrant, PROVIDER shall deliver the information set forth above via United States mail, courier, or e-mail to the following:

TFO Anthony Tomeo
FBI Tampa Field Office
480 S Keller Rd
Orlando, FL 32810
Email: altomeo@fbi.gov

## II.    Information to be seized by the government

All information described above in Section I that constitutes fruits, contraband, evidence, and instrumentalities of violations of 18 U.S.C. §§ 1512(c)(2), 1752(a), and 40 U.S.C. §§ 5104(e)(2)(D) and (G), as well as conspiracy (18 U.S.C. § 371) and aiding and abetting (18 U.S.C. § 2) efforts to do same (collectively, the "SUBJECT OFFENSES"), as described in the affidavit submitted in support of this Warrant, including, for each Account, items, records,

documents, or information pertaining to the following matters:

a.    the identification or location of the user(s) of the Account;

b.    how and when the Account was accessed or used, to determine the geographic and chronological context of Account access, use, and events relating to the SUBJECT OFFENSES and to the Account user(s);

c.    the identification of the Subject and other persons, including photographs and videos depicting clothing and other articles and paraphernalia that reflect evidence of having been present at or near the U.S. Capitol Building on or around January 6, 2021;

d.    the identification of persons who either (i) collaborated, conspired, or assisted (knowingly or unknowingly) the commission of the SUBJECT OFFENSES; or (ii) communicated about matters relating to the SUBJECT OFFENSES, including records that help reveal their whereabouts;

e.    the U.S. Capitol Building, including any maps or diagrams of the Building or its internal offices, or presence at, or inside of or on the grounds of, the Building on or around January 6, 2021, including any planning, preparation, or travel;

f.    challenges to or questions about the legitimacy of the 2020 Presidential Election, including awareness of, or any efforts or intent to disrupt, the certification process of the 2020 Presidential Election, or otherwise influence the policy or composition of the United States government by intimidation or coercion;

g.    materials, devices, tools, plans, or strategies to enter or assist others in entering the U.S. Capitol Building on or about January 6, 2021, by deceit or by force, including weapons and elements used to breach the building or to counter efforts by law enforcement, such as pepper spray or smoke grenades;

h.  communication devices, including closed circuit radios, walkie-talkies, or secure or encrypted "apps," related to the directing of others or direct presence at, inside of, or on the grounds of, the U.S. Capitol Building on or around January 6, 2021;

i.  any conspiracy, planning, or preparation (including financing) to commit the SUBJECT OFFENSES, or efforts to conceal evidence of the SUBJECT OFFENSES from law enforcement, or to flee prosecution for the SUBJECT OFFENSES;

j.  the state of mind of the Subject and/or co-conspirators, e.g., intent, absence of mistake, or evidence indicating preparation, planning, knowledge, or experience, including but not limited to tactical training or tactical equipment, related to the SUBJECT OFFENSES;

k.  assaults of federal officers/agents and efforts to impede such federal officers/agents in the performance of their duties the United States Capitol on January 6, 2021;

l.  damage to, or theft of, property at the United States Capitol on January 6, 2021; and

m.  affiliation or communication with the Proud Boys, including members thereof.

This warrant authorizes a review of electronically stored information, communications, other records and information disclosed pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

**III.    Government procedures for warrant execution**

The United States government will conduct a search of the information produced by the PROVIDER and determine which information is within the scope of the information to be seized specified in Section II.  That information that is within the scope of Section II may be copied and retained by the United States.

Law enforcement personnel will then seal any information from the PROVIDER that does not fall within the scope of Section II and will not further review the information absent an order of the Court.  Such sealed information may include retaining a digital copy of all information received pursuant to the warrant to be used for authentication at trial, as needed.

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

IN THE MATTER OF THE SEARCH OF
INFORMATION ASSOCIATED WITH
ONE ACCOUNT STORED AT
PREMISES CONTROLLED BY
GOOGLE LLC PURSUANT TO 18 U.S.C.
2703 FOR INVESTIGATION OF
VIOLATION OF 18 U.S.C. §§ 2, 371,
1512(c)(2), 1752(a) AND 40 U.S.C. §§
5104(e)(2)(D) AND (G)

SC No. 21-sc-1711

<u>Filed Under Seal</u>

Reference:    *USAO Ref. # 2021R00318/2021R00162; Subject Account(s):*
*arthur@expansiveman.com*

**AFFIDAVIT IN SUPPORT OF**
**<u>AN APPLICATION FOR A SEARCH WARRANT</u>**

I, Anthony Tomeo, being first duly sworn, hereby depose and state as follows:

<u>INTRODUCTION AND AGENT BACKGROUND</u>

1.      I make this affidavit in support of an application for a search warrant for information

which is associated with one account – that is, arthur@expansiveman.com (the "Account") – which

is stored at premises controlled by Google LLC ("PROVIDER"), an electronic communications

services provider and/or remote computing services provider which is headquartered at / which

accepts service at 1600 Amphitheatre Parkway, Mountain View, California. The information to be

searched is described in the following paragraphs and in Attachment A.  This affidavit is made in

support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), and

2703(c)(1)(A) to require PROVIDER to disclose to the government copies of the information

(including the content of communications) further described in Section I of Attachment B.  Upon

receipt of the information described in Section I of Attachment B, government-authorized persons

9

will review that information to locate the items described in Section II of Attachment B, using the procedures described in Section III of Attachment B.

2.      I am a Task Force Officer with the Federal Bureau of Investigation (FBI) and have been so since 2013.  As such, I am an officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in Titles 18 and 21 of the United States Code.  I have testified during an array of judicial proceedings, conducted physical and electronic surveillance, administered confidential sources, and received training as investigative techniques evolve. I have interviewed hundreds of defendants, witnesses, and informants.  In addition to my regular duties, I am currently also tasked with investigating criminal activity that occurred in and around the Capitol grounds on January 6, 2021.

3.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, witnesses, and agencies.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant.  It does not set forth all of my knowledge, or the knowledge of others, about this matter.

4.      Based on my training and experience and the facts as set forth in this affidavit, I respectfully submit that there is probable cause to believe that violations of 18 U.S.C. §§ 1512(c), 1752(a), 40 U.S.C. § 5104(e), and conspiracy (18 U.S.C. § 371) and aiding and abetting (18 U.S.C. § 2) to commit violations of same have been committed by Arthur Stanley JACKMAN and other identified and other unidentified persons associated with JACKMAN.  There is also probable cause to search the information described in Attachment A for evidence, instrumentalities, contraband, or fruits of these crimes further described in Attachment B.

## JURISDICTION

5.      This Court has jurisdiction to issue the requested warrant because it is a "court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  18 U.S.C. §§ 2703(a), (b)(1)(A), and (c)(1)(A).  Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated."  18 U.S.C. § 2711(3)(A)(i).  As discussed more fully below, acts or omissions in furtherance of the offenses under investigation occurred within Washington, DC. *See* 18 U.S.C. § 3237.

## PROBABLE CAUSE

6.      Arthur JACKMAN is a 31-year-old resident of the state of Florida. JACKMAN has identified himself as a member of a group known as the Proud Boys, and he has a Proud Boys tattoo on his left wrist. As further described herein, JACKMAN engaged in unlawful activity at the U.S. Capitol on January 6, 2021.

7.      The Proud Boys describes itself as a "pro-Western fraternal organization for men who refuse to apologize for creating the modern world; aka Western Chauvinists." Proud Boys members routinely attend rallies, protests, and other events, some of which have resulted in violence involving members of the group. There is an initiation process for new members of the Proud Boys, and members often wear black and yellow polo shirts or other apparel adorned with Proud Boys logos to public events.

The *Attack on the U.S. Capitol Building and Grounds*

8.      The U.S. Capitol, which is located at First Street, SE, in Washington, D.C., is secured 24 hours a day by U.S. Capitol Police. Restrictions around the U.S. Capitol include permanent and temporary security barriers and posts manned by U.S. Capitol Police. Only

11

authorized people with appropriate identification are allowed access inside the U.S. Capitol.

9.      On January 6, 2021, the exterior plaza of the U.S. Capitol was closed to members of the public. A Joint Session of the United States House of Representatives and the United States Senate ("the Joint Session") convened in the United States Capitol building ("the Capitol") to certify the vote of the Electoral College of the 2020 U.S. Presidential Election ("the Electoral College vote"). During the Joint Session, elected members of the United States House of Representatives and the United States Senate were meeting in separate chambers of the United States Capitol to certify the vote count of the Electoral College of the 2020 Presidential Election, which had taken place on November 3, 2020. The joint session began at approximately 1:00 p.m. Shortly thereafter, by approximately 1:30 p.m., the House and Senate adjourned to separate chambers to resolve a particular objection. Vice President Mike Pence was present and presiding, first in the joint session, and then in the Senate chamber.

10.      On January 6, 2021, at approximately 12:45 p.m., a large crowd began to gather outside the Capitol perimeter. Among other areas, a large crowd gathered near the pedestrian entrance to the Capitol grounds on First Street, Northwest, near the Peace Monument. The entrance was guarded by Capitol Police. Signage was prominently posted on metal barriers at the pedestrian entrance and other locations that read, "AREA CLOSED By order of the United States Capitol Police Board."

11.      Shortly thereafter, two men advanced toward the waist-high metal gate. A crowd followed, and within minutes, the crowd overwhelmed the U.S. Capitol Police who were standing behind the metal barriers. A crowd then advanced toward the U.S. Capitol.

12.      After overwhelming the pedestrian gate near the Peace Monument and other

entrances, a crowd advanced on the U.S. Capitol where another line of U.S Capitol Police and barricades attempted to stop the crowd from advancing to the walls of the building. Additional people continued to arrive until what some have estimated to be thousands of people had gathered in front of the Capitol on its west side.

13.     At approximately 2:00 p.m., certain individuals in the crowd forced their way through, up, and over the barricades, and officers of the U.S. Capitol Police, and the crowd advanced to the exterior façade of the building. The crowd was not lawfully authorized to enter or remain in the building and, prior to entering the building, no members of the crowd submitted to security screenings or weapons checks by U.S. Capitol Police Officers or other authorized security officials.

14.     At such time, the certification proceedings were still underway, and the exterior doors and windows of the U.S. Capitol were locked or otherwise secured. Members of the U.S. Capitol Police attempted to maintain order and keep the crowd from entering the Capitol; however, shortly after 2:00 p.m., individuals in the crowd forced entry into the U.S. Capitol, including by breaking windows and by assaulting members of the U.S. Capitol Police, as others in the crowd encouraged and assisted those acts.

15.     Shortly thereafter, members of the United States House of Representatives and United States Senate, including the President of the Senate, Vice President Pence, were instructed to—and did—evacuate the chambers. Accordingly, all proceedings of the United States Congress, including the joint session, were effectively suspended until shortly after 8:00 p.m. the same day. In light of the dangerous circumstances caused by the unlawful entry to the U.S. Capitol, including the danger posed by individuals who had entered the U.S. Capitol without any security screening

or weapons check, Congressional proceedings could not resume until after every unauthorized occupant had left the U.S. Capitol, and the building had been confirmed secured. The proceedings resumed at approximately 8:00 p.m. after the building had been secured. Vice President Pence remained in the United States Capitol from the time he was evacuated from the Senate Chamber until the session resumed.

16.     During national news coverage of the aforementioned events, video footage which appeared to be captured on mobile devices of persons present on the scene depicted evidence of violations of local and federal law, including scores of individuals inside the U.S. Capitol building without authority to be there.

*JACKMAN's Participation in Unlawful Events at the Capitol on January 6, 2021*

17.     Shortly after plans for the January 6, 2021, demonstration were announced, certain leadership figures of the Proud Boys announced that the Proud Boys would attend the demonstration in Washington, D.C. Among other things, the self-described chairman of the Proud Boys announced that the Proud Boys would turn out in record numbers, but Proud Boys would be attending "incognito" instead of attending in their traditional black and yellow clothes. Similarly, a self-described organizer of the Proud Boys, Joseph Biggs ("Biggs"), stated that he and "other leadership" had decided to attend in plain clothes to blend in.[1]

18.     On January 6, 2021, individuals that have been identified as a group of people that hold themselves out as Proud Boys were depicted on the east side of the U.S. Capitol. Consistent

---

[1]     On March 10, 2021, a grand jury returned a superseding indictment that charges Joseph Biggs and other Proud Boys members Ethan Nordean, Zachary Rehl, and Charles Donohoe with conspiracy to obstruct an official proceeding of Congress and interference with law enforcement during a civil disorder in violation of 18 U.S.C. § 371, as well as violations of 18 U.S.C. §§ 231(a)(3), 1361, 1512(c)(2), and aiding and abetting violations of same, and 18 U.S.C. § 1752(a)(1) and (2).

14

with the directive issued by organizers of the Proud Boys, including Biggs, none of the men pictured were wearing Proud Boys colors of black and yellow, but were instead dressed "incognito." Indeed, Biggs, wearing glasses and a dark knit hat, can be seen below dressed in a blue and grey plaid shirt.



19.    Biggs and other identified leaders of the Proud Boys led a group to the First Street pedestrian gate on the west side of the Capitol shortly before 12:53 p.m. As described above, a group advanced toward the pedestrian gate and overwhelmed law enforcement officers. The crowd, including several identified Proud Boys, unlawfully advanced toward the Capitol while intentionally and forcibly removing metal barriers that had been deployed by law enforcement to protect the Capitol and its occupants.

20.    Among those leading the walk to the next barrier were Proud Boys Dominic Pezzola

(in black hat and sunglasses below) and William Pepe (in flag bandana below).[2] Upon arriving at the next barrier, Pepe dragged a segment of the fence away, which left U.S. Capitol Police officers temporarily without barrier.





_____

[2]      Dominic Pezzola and William Pepe were charged by indictment on January 29, 2021, in case number 21-cr-52 (D.D.C.). Charges include conspiracy to interfere with law enforcement as well as other individual charges, for their actions at and inside the U.S. Capitol on or about January 6, 2021. As described below, Pezzola has been photographed at Proud Boys rallies. The FBI also executed search warrants at both Pezzola's and Pepe's residences and found Proud Boys paraphernalia.

16

21.   The next police line was overwhelmed by crowds and the crowd advanced to the front of the U.S. Capitol. Additional people continued to arrive and gather on the west side of the Capitol.

22.   A person that I recognize as JACKMAN (on left) can be seen in the image below standing in close proximity to Proud Boys Biggs and Rehl (on right), who had been leading the Proud Boys earlier in the day.



23.   Individuals in the crowd continued to forcibly advance toward the Capitol building past law enforcement who were attempting to stop them. Shortly before 2:13 p.m., and as seen in the image below, Proud Boys member Dominic Pezzola used a riot shield that belonged to the Capitol Police to break windows of the U.S. Capitol building. Pezzola and others then entered the building through the window. Rioters entered the building and opened an adjacent door. The damage to the window is estimated at over $1,000.



24.     Among the rioters who entered the building through the adjacent door was Biggs. Biggs entered within approximately 50 seconds of the door's opening. In a video posted publicly on the social media site Parler, Biggs can be seen entering the Capitol. After entering, a voice off camera said, "Hey Biggs, what do you gotta say?" Biggs smiled broadly and replied, "this is awesome!" before pulling his gaiter up to cover his face.

18



25.     Your affiant and other members of law enforcement have studied video footage and still photographs of the January 6, 2021, incursion of the U.S. Capitol. As described herein, the images and video footage that I have reviewed, as well as the other facts gathered in this investigation, establish that JACKMAN did unlawfully enter or remain in the U.S. Capitol as a direct result of others' destruction of federal property and did corruptly obstruct the official proceedings underway at the U.S. Capitol on January 6, 2021.

26.     At approximately 2:39 p.m., publicly available footage shows a group of individuals that I recognize as Biggs, JACKMAN, and other identified and unidentified persons moving back toward the Capitol.  Shortly thereafter, at approximately 2:40 p.m., JACKMAN entered the Capitol building.



27.     On or about January 22, 2021, federal agents with the FBI interviewed a witness (W-1).  W-1, a childhood friend of JACKMAN, reported to FBI that W-1 had texted JACKMAN during the Capitol riots and asked JACKMAN whether he was involved.  According to W-1, JACKMAN texted back that he was, and subsequently texted a photo of himself inside the Capitol. W-1 asserted that W-1 had deleted the text and picture, but W-1 asserted that before doing so, W1 had sent the text and picture to another individual (W-2). W-2 subsequently provided a photograph to the FBI that W-2 asserted W-2 had received from W-1. This image is included below.



28.     W-1 also provided the FBI with a video that had been recorded by a New Yorker reporter and subsequently posted online. In the video, W-1 identified the person seen below in the red plaid shirt with black gaiter as JACKMAN. The screen capture below shows JACKMAN walking up a flight of stairs behind a person that I recognize as wearing the same clothing as Proud Boy organizer, Joe Biggs. In the second image below, JACKMAN can be seen with his hand on such person's shoulder.





29.     Based on my extensive review of video footage of the events of January 6, 2021, your affiant asserts that JACKMAN can also be seen in the image below standing in the gallery of the Senate chamber.



30.    Another screen capture of the video appears to show JACKMAN taking a "selfie" inside the Senate chamber. Notably, JACKMAN's cell phone appears to have insignia that I recognize as being associated with the Proud Boys (i.e., a yellow laurel wreath co-opted from the clothing brand, Fred Perry). In the selfie, JACKMAN appears to be making a gesture that I recognize as being associated with the Proud Boys (i.e., the "okay" symbol).



31.    Your affiant notes that the photograph that was provided by W-2 (and seen in paragraph 27) appears to be a mirror image of the image that could have been captured by a "selfie" taken in the preceding paragraph.

32.     On or about January 19, 2021, federal agents with the FBI interviewed JACKMAN at his residence. JACKMAN participated voluntarily. Among other things, JACKMAN stated that:

a.   He was a Proud Boys member and had been since 2016;

b.   He became involved in the Proud Boys to support Donald Trump;

c.   He was in Washington, D.C., on January 6, 2021;

d.   He went to Washington, D.C. to be a "visual representation, to support President Trump and to stop the steal;"

e.   He believes the election was stolen;

f.   He and other Proud Boys were not there to infiltrate the Capitol as it was not a sanctioned Proud Boys event; and

g.   He had "no comment" as to whether he was inside the Capitol on January 6, 2021, or if any pictures would show him inside.

33.     On or about March 30, 2021, federal agents executed an arrest and search warrant on JACKMAN at his residence.  Pursuant to the search warrant, JACKMAN'S One Plus brand cellular telephone was recovered.

34.     Lawfully obtained digital evidence from an account associated with Biggs included a photograph of Proud Boys members Biggs, JACKMAN, and three other individuals on the steps on the east side of the Capitol during the riot on January 6, 2021. Three of the men appear to be making a hand gesture that I recognize as one used by the Proud Boys.

24



35.     During national news coverage of the aforementioned events, video footage which appeared to be captured on mobile devices of persons present on the scene depicted evidence of violations of local and federal law, including scores of individuals inside the U.S. Capitol building without authority to be there.

36.     Based on my training and experience, I know that it is common for individuals to carry and use their cell phones during large gatherings, such as the gathering that occurred in the area of the U.S. Capitol on January 6, 2021.  Such phones are typically carried at such gatherings to allow individuals to capture photographs and video footage of the gatherings, to communicate with other individuals about the gatherings, to coordinate with other participants at the gatherings, and to post on social media and digital forums about the gatherings.

37.     Many subjects seen on news footage in the area of the U.S. Capitol are using a cell phone in some capacity.  It appears some subjects were recording the events occurring in and around the U.S. Capitol and others appear to be taking photos, to include photos and video of

themselves after breaking into the U.S. Capitol itself, including photos of themselves damaging and stealing property.  As reported in the news media, others inside and immediately outside the U.S. Capitol live-streamed their activities, including those described above as well as statements about these activities.

38.     Lawfully-obtained   Google   records   indicate   that   the   email   address zylowolf@gmail.com is currently registered to user "Arthur J," with a login as recent as February 8, 2021.  Google records also indicate that the Account and the zylowolf@gmail.com email address serve as recovery emails for each other.  The telephone number associated with the Account matches the telephone number with a registered user of "Arthur Jackman" in the wireless provider's records.

39.     Lawfully-obtained Google records show that the Account was connected to Google services and was present in or around the U.S. Capitol on January 6, 2021 between 2:14pm and 3:28pm. Google estimates device location using sources including GPS data and information about nearby Wi-Fi access points and Bluetooth beacons.  This location data varies in its accuracy, depending on the source(s) of the data.  As a result, Google assigns a "maps display radius" for each location data point.  Thus, where Google estimates that its location data is accurate to within 10 meters, Google assigns a "maps display radius" of 10 meters to the location data point.  Finally, Google reports that its "maps display radius" reflects the actual location of the covered device approximately 68% of the time.  In this case, Google location data shows that a device associated with the Account inside various locations within the Senate wing (*i.e.*, the Northern end) of the Capitol, which is consistent with the photographs included at paragraphs 27, 29 and 30. As discussed herein, the background of that photograph indicates that the photograph was taken from

inside the Senate chamber.  Google records show that the "maps display radius" for this location

data was 100 feet, which encompasses an area that is entirely within the U.S. Capitol Building for

certain data points and partially within the U.S. Capitol Building for other data points.

40.     As discussed herein at paragraphs 27, 29, 30 and 39, JACKMAN appears to have

used his cellular telephone to take photographs and communicate while inside the Capitol on

January 6, 2021. For the foregoing reasons, there is probable cause to believe that the Account will

contain fruits, contraband, evidence, and instrumentalities of violations of 18 U.S.C. §§ 1512(c)(2),

1752(a), and 40 U.S.C. §§ 5104(e)(2)(D) and (G), as well as conspiracy (18 U.S.C. § 371) and

aiding and abetting (18 U.S.C. § 2) efforts to do same (collectively, the "SUBJECT OFFENSES")

by JACKMAN and other individuals whose identities are both known and unknown to the affiant.

## BACKGROUND CONCERNING PROVIDER'S ACCOUNTS

41.     According to an open-source database inquiry, the domain "expansiveman.com" is

registered to "www.godaddy.com," which is a Google reseller.   Accordingly, PROVIDER is the

provider of the internet-based account identified by arthur@expansiveman.com (i.e., the Account).

42.     PROVIDER provides its subscribers internet-based accounts that allow them to

send, receive, and store e-mails online.  PROVIDER accounts are typically identified by a single

username, which serves as the subscriber's default e-mail address, but which can also function as

a subscriber's username for other PROVIDER services, such as instant messages and remote photo

or file storage.

43.     Based on my training and experience, I know that PROVIDER allows subscribers

to obtain accounts by registering on PROVIDER's website.   During the registration process,

PROVIDER asks subscribers to create a username and password, and to provide basic personal

information such as a name, an alternate e-mail address for backup purposes, a phone number, and in some cases a means of payment. PROVIDER typically does not verify subscriber names. However, PROVIDER does verify the e-mail address or phone number provided.

44.     Once a subscriber has registered an account, PROVIDER provides e-mail services that typically include folders such as an "inbox" and a "sent mail" folder, as well as electronic address books or contact lists, and all of those folders are linked to the subscriber's username. PROVIDER subscribers can also use that same username or account in connection with other services provided by PROVIDER.[3]

45.     In general, user-generated content (such as e-mail) that is written using, stored on, sent from, or sent to a PROVIDER account can be permanently stored in connection with that account, unless the subscriber deletes the material. For example, if the subscriber does not delete an e-mail, the e-mail can remain on PROVIDER's servers indefinitely. Even if the subscriber deletes the e-mail, it may continue to exist on PROVIDER's servers for a certain period of time.

46.     Thus, a subscriber's PROVIDER account can be used not only for e-mail but also

---

[3]     Here, PROVIDER's other services include electronic communication services such as Google Voice (voice calls, voicemail, and SMS text messaging), Hangouts (instant messaging and video chats), Google+ (social networking), Google Groups (group discussions), Google Photos (photo sharing), and YouTube (video sharing); web browsing and search tools such as Google Search (internet searches), Web History (bookmarks and recorded browsing history), and Google Chrome (web browser); online productivity tools such as Google Calendar, Google Contacts, Google Docs (word processing), Google Keep (storing text), Google Drive (cloud storage), Google Maps (maps with driving directions and local business search) and other location services, and Language Tools (text translation); online tracking and advertising tools such as Google Analytics (tracking and reporting on website traffic) and Google AdWords (user targeting based on search queries); Pixel Phone (services which support a Google smartphone); and Google Play (which allow users to purchase and download digital content, e.g., applications).

for other types of electronic communication, including instant messaging and photo and video sharing; voice calls, video chats, SMS text messaging; social networking.  Depending on user settings, user-generated content derived from many of these services is normally stored on PROVIDER's servers until deleted by the subscriber.  Similar to e-mails, such user-generated content can remain on PROVIDER's servers indefinitely if not deleted by the subscriber, and even after being deleted, it may continue to be available on PROVIDER's servers for a certain period of time.  Furthermore, a PROVIDER subscriber can store contacts, calendar data, images, videos, notes, documents, bookmarks, web searches, browsing history, and various other types of information on PROVIDER's servers.  Based on my training and experience, I know that evidence of who controlled, used, and/or created a PROVIDER account may be found within such computer files and other information created or stored by the PROVIDER subscriber. Based on my training and experience, I know that the types of data discussed above can include records and communications that constitute evidence of criminal activity.

47.     Based on my training and experience, I know that providers such as PROVIDER also collect and maintain information about their subscribers, including information about their use of PROVIDER services.  This information can include the date on which the account was created, the length of service, records of log-in (*i.e.*, session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via the provider's website), and other log files that reflect usage of the account.  Providers such as PROVIDER also commonly have records of the Internet Protocol address ("IP address") used to register the account and the IP addresses associated with other logins to the account.  Because every device that

connects to the Internet must use an IP address, IP address information can help to identify which devices were used to access the relevant account. Also, providers such as PROVIDER typically collect and maintain location data related to subscriber's use of PROVIDER services, including data derived from IP addresses and/or Global Positioning System ("GPS") data.

48.   Based on my training and experience, I know that providers such as PROVIDER also collect information relating to the devices used to access a subscriber's account – such as laptop or desktop computers, cell phones, and tablet computers. Such devices can be identified in various ways. For example, some identifiers are assigned to a device by the manufacturer and relate to the specific machine or "hardware," some identifiers are assigned by a telephone carrier concerning a particular user account for cellular data or voice services, and some identifiers are actually assigned by PROVIDER in order to track what devices are using PROVIDER's accounts and services. Examples of these identifiers include unique application number, hardware model, operating system version, Global Unique Identifier ("GUID"), device serial number, mobile network information, telephone number, Media Access Control ("MAC") address, and International Mobile Equipment Identity ("IMEI"). Based on my training and experience, I know that such identifiers may constitute evidence of the crimes under investigation because they can be used (a) to find other PROVIDER accounts created or accessed by the same device and likely belonging to the same user, (b) to find other types of accounts linked to the same device and user, and (c) to determine whether a particular device recovered during course of the investigation was used to access the PROVIDER account.

49.   PROVIDER also allows its subscribers to access its various services through an application that can be installed on and accessed via cellular telephones and other mobile devices.

This application is associated with the subscriber's PROVIDER account.  In my training and experience, I have learned that when the user of a mobile application installs and launches the application on a device (such as a cellular telephone), the application directs the device in question to obtain a Push Token, a unique identifier that allows the provider associated with the application (such as PROVIDER) to locate the device on which the application is installed.  After the applicable push notification service (*e.g.*, Apple Push Notifications (APN) or Google Cloud Messaging) sends a Push Token to the device, the Token is then sent to the application, which in turn sends the Push Token to the application's server/provider.  Thereafter, whenever the provider needs to send notifications to the user's device, it sends both the Push Token and the payload associated with the notification (*i.e.*, the substance of what needs to be sent by the application to the device).  To ensure this process works, Push Tokens associated with a subscriber's account are stored on the provider's server(s).  Accordingly, the computers of PROVIDER are likely to contain useful information that may help to identify the specific device(s) used by a particular subscriber to access the subscriber's PROVIDER account via the mobile application.

50.     Based on my training and experience, I know that providers such as PROVIDER use cookies and similar technologies to track users visiting PROVIDER's webpages and using its products and services.  Basically, a "cookie" is a small file containing a string of characters that a website attempts to place onto a user's computer.  When that computer visits again, the website will recognize the cookie and thereby identify the same user who visited before.  This sort of technology can be used to track users across multiple websites and online services belonging to PROVIDER.  More sophisticated cookie technology can be used to identify users across devices and web browsers.  From training and experience, I know that cookies and similar technology used

by providers such as PROVIDER may constitute evidence of the criminal activity under investigation. By linking various accounts, devices, and online activity to the same user or users, cookies and linked information can help identify who was using a PROVIDER account and determine the scope of criminal activity.

51.     Based on my training and experience, I know that PROVIDER maintains records that can link different PROVIDER accounts to one another, by virtue of common identifiers, such as common e-mail addresses, common telephone numbers, common device identifiers, common computer cookies, and common names or addresses, that can show a single person, or single group of persons, used multiple PROVIDER accounts. Based on my training and experience, I also know that evidence concerning the identity of such linked accounts can be useful evidence in identifying the person or persons who have used a particular PROVIDER account.

52.     Based on my training and experience, I know that subscribers can communicate directly with PROVIDER about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users. Providers such as PROVIDER typically retain records about such communications, including records of contacts between the user and the provider's support services, as well records of any actions taken by the provider or user as a result of the communications. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

53.     In summary, based on my training and experience in this context, I believe that the computers of PROVIDER are likely to contain user-generated content such as stored electronic communications (including retrieved and unretrieved e-mail for PROVIDER subscribers), as well

as PROVIDER-generated information about its subscribers and their use of PROVIDER services and other online services.  In my training and experience, all of that information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.  In fact, even if subscribers provide PROVIDER with false information about their identities, that false information often nevertheless provides clues to their identities, locations, or illicit activities.

54.     As explained above, information stored in connection with a PROVIDER account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element of the offense, or, alternatively, to exclude the innocent from further suspicion.  From my training and experience, I know that the information stored in connection with a PROVIDER account can indicate who has used or controlled the account.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, e-mail communications, contacts lists, and images sent (and the data associated with the foregoing, such as date and time) may indicate who used or controlled the account at a relevant time.  Further, information maintained by PROVIDER can show how and when the account was accessed or used. For example, providers such as PROVIDER typically log the IP addresses from which users access the account along with the time and date.  By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the PROVIDER account access and use relating to the criminal activity under investigation.  This geographic and timeline information may tend to either inculpate or exculpate the person who controlled, used, and/or created the account.  Additionally, information stored at the user's account

may further indicate the geographic location of the account user at a particular time (*e.g.*, location information integrated into an image or video sent via e-mail). Finally, stored electronic data may provide relevant insight into the user's state of mind as it relates to the offense under investigation. For example, information in the PROVIDER account may indicate its user's motive and intent to commit a crime (*e.g.*, communications relating to the crime), or consciousness of guilt (*e.g.*, deleting communications in an effort to conceal them from law enforcement).[4]

55.     Based on my training and experience, I know that evidence of who controlled, used, and/or created a PROVIDER account may be found within the user-generated content created or stored by the PROVIDER subscriber.  This type of evidence includes, for example, personal correspondence, personal photographs, purchase receipts, contact information, travel itineraries, and other content that can be uniquely connected to a specific, identifiable person or group.  In addition, based on my training and experience, I know that this type of user-generated content can provide crucial identification evidence, whether or not it was generated close in time to the offenses under investigation.  This is true for at least two reasons.  First, people that commit crimes involving electronic accounts (*e.g.*, e-mail accounts) typically try to hide their identities, and many people are more disciplined in that regard right before (and right after) committing a particular crime.  Second, earlier-generated content may be quite valuable, because criminals typically improve their tradecraft over time.  That is to say, criminals typically learn how to better separate

---

[4]     At times, internet services providers such as PROVIDER can and do change the details and functionality of the services they offer.  While the information in this section is true and accurate to the best of my knowledge and belief, I have not specifically reviewed every detail of PROVIDER's services in connection with submitting this application for a search warrant. Instead, I rely upon my training and experience, and the training and experience of others, to set forth the foregoing description for the Court.

their personal activity from their criminal activity, and they typically become more disciplined about maintaining that separation, as they become more experienced.  Finally, because e-mail accounts and similar PROVIDER accounts do not typically change hands on a frequent basis, identification evidence from one period can still be relevant to establishing the identity of the account user during a different, and even far removed, period of time.

### REQUEST TO SUBMIT WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

56.     I respectfully request, pursuant to Rules 4.1 and 41(d)(3) of the Federal Rules of Criminal Procedure, permission to communicate information to the Court by telephone in connection with this Application for a Search Warrant. I submit that Assistant U.S. Attorney Nadia E. Moore, an attorney for the United States, is capable of identifying my voice and telephone number for the Court.

## **CONCLUSION**

57.     Based on the forgoing, I request that the Court issue the proposed search warrant. Because the warrant will be served on PROVIDER, who will then compile the requested records at a time convenient to it, there exists reasonable cause to permit the execution of the requested warrant at any time in the day or night.  Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.


Respectfully submitted,


Anthony L. Tomeo, Task Force Officer
Federal Bureau of Investigation


Subscribed and sworn pursuant to Fed. R. Crim. P. 4.1 and 41(d)(3) on May 26, 2021.


_____
ROBIN M. MERIWEARHER
UNITED STATES MAGISTRATE JUDGE

36

## CERTIFICATE OF AUTHENTICITY OF DOMESTIC
## RECORDS PURSUANT TO FEDERAL RULES OF
## EVIDENCE 902(11) AND 902(13)

I, _____, attest, under penalties of perjury by the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this certification is true and correct.  I am employed by _____ ("PROVIDER"), and my title is _____.
I am a custodian of records for PROVIDER, and I am qualified to authenticate the records attached hereto because I am familiar with how the records were created, managed, stored, and retrieved.  I state that the records attached hereto are true duplicates of the original records in the custody of PROVIDER.  The attached records consist of:

_____

[GENERALLY DESCRIBE RECORDS (pages/CDs/megabytes)]

I further state that:

a.   all records attached to this certificate were made at or near the time of the occurrence of the matter set forth by, or from information transmitted by, a person with knowledge of those matters, they were kept in the ordinary course of the regularly conducted business activity of PROVIDER, and they were made by PROVIDER as a regular practice; and

b.   such records were generated by PROVIDER's electronic process or system that produces an accurate result, to wit:

1.   the records were copied from electronic device(s), storage medium(s), or file(s) in the custody of PROVIDER in a manner to ensure that they are true duplicates of the original records; and

2.   the process or system is regularly verified by PROVIDER, and at all times pertinent to the records certified here the process and system functioned properly and normally.

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.


_____     _____

Date                                 Signature

37